UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Jaavel L. McCrae, minor children J.M., L.M., and D.M., and Kiana Trent<br><br>Plaintiffs,<br><br>v.<br><br>Town of Brookhaven, County of Suffolk, Police Officer Francesco Provenzano, Police Officer Anthony Fanwick, Ed Romaine, Dan Panico, Neil Foley, Amanda Paccione, William Schott, Patrick Campbell, and Jane and John Doe(s) 1-10, *in their individual and official capacities*,<br><br>Defendants. | 18-cv-07061 (NRM) (LB)<br><br>**MEMORANDUM AND ORDER** |

NINA R. MORRISON, United States District Judge:

Plaintiff Jaavel L. McCrae brings this action under 42 U.S.C. § 1983 and New York State law, stemming from a December 12, 2017 encounter between him, Town of Brookhaven Defendants Amanda Paccione, Patrick Campbell, and William Schott ("Town Defendants"), and County of Suffolk Defendants Police Officers Francesco Provenzano and Anthony Fanwick ("County Defendants").

Presently before the Court are Defendants' joint motions for summary judgment to dismiss all claims.  For the reasons to follow, the Court grants in part and denies in part Defendants' motions for summary judgment.

1

## FACTUAL BACKGROUND

The Court views the following facts "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Mil. & Naval Affs.*, 373 F.3d 83, 89 (2d Cir. 2004), and "resolve[s] all ambiguities and draw[s] all permissible factual inferences in favor of the party against whom summary judgment is sought." *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

In considering the parties' motions, the Court has carefully reviewed the parties' Rule 56.1 Statements and has independently assessed the underlying record to determine whether genuine issues of material fact exist and summary judgment is appropriate. *See Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016) ("If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." (quoting *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995))). The Court deems admitted those factual assertions that are not specifically controverted with citations to admissible evidence. *See* Local Civ. R. 56.1(c)–(d); *Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004).

## I.    The Complaints at 3 Grouse Court

On August 21, 2017, the Town of Brookhaven ("Town") received a complaint that the residence at 3 Grouse Court, Medford, New York, was abandoned, but the back door was open. *See* Full Compl. Report dated Aug. 21, 2017, Town's Ex. K, ECF No. 104-12. The complaint was categorized as a violation of the "Vacant Building

Registry," and it was deemed unfounded, as the premises were secure. *Id.* On September 11, 2017, the Town received another complaint about the property, and while verifying that the house was "vacant and secure," the investigator noted that there were "signs of attempted entry." Full Compl. Report dated Sept. 11, 2017, Town's Ex. L, ECF No. 104-13. Finally, on December 7, 2017, Suffolk County Police Officer Fanwick responded to an anonymous complaint that someone was "attempting to squat in the abandoned home." SCPD Compl. dated Dec. 7, 2017, Town's Ex. M, ECF No. 104-14. Officer Fanwick concluded that the house was secure and no one was present. *Id.*

## II.    McCrae's Residence Until December 12, 2017

Prior to living in 3 Grouse Court, Jaavel L. McCrae lived in a home next door at 1 Grouse Court for approximately one year. *See* McCrae Dep., Town's Ex. N at 106–07, ECF 104-15. Through a settlement, McCrae agreed to vacate 1 Grouse Court in consideration of receiving $15,000. *See* Stipulation of Settlement, Town's Ex. O, ECF 104-16. The parties dispute *when* McCrae actually moved from 1 Grouse Court to 3 Grouse Court. The Town contends that he vacated 1 Grouse Court no earlier than November 29, 2017, as McCrae filed a W-9 Form on that date listing 1 Grouse Court as his address. *See* Town's Rule 56.1 Statement ¶ 24, ECF No. 104-19 (citing W-9 Form, Town's Ex. P, ECF No. 104-17). However, McCrae insists that he moved from 1 Grouse Court to 3 Grouse Court on October 15, 2017. McCrae Dep. at 22. Either way, at some point before the events of December 12, 2017, McCrae took up residence at 3 Grouse Court.

3

McCrae claims that prior to moving into 3 Grouse Court, he had signed a "rent-to-buy" lease with the Kims — the owners of the property. *Id.* at 27, 29. He claims that rent was $2,400, and that he paid the Kims two months' rent upfront, plus a security deposit, for a total of $7,200. *Id.* at 30. Because he moved in on October 15, 2017, he never paid his next rent installment, which was due on December 15, 2017, as the events at issue here happened on December 12. *See id.* at 33.

While living at 3 Grouse Court, McCrae complained to the authorities about his neighbor(s) twice, once on December 2, 2017, because a neighbor "curs[ed] at him and spit in [his] face," Police Compl. Reports, McCrae's Ex. 2 at 2, ECF 105-2, and once on December 4, 2017, for an ongoing problem where a neighbor "intentionally revs his engine on his Ford diesel truck early in the morning." *Id.* at 3.

## III.    The Events of December 12, 2017

On December 12, 2017, Town Investigator Paccione was sent to investigate 3 Grouse Court because her supervisor had asked her to respond to an address that was "supposed to be vacant and it appear[ed] somebody [was] living in it." Paccione Dep. dated May 12, 2021, Town's Ex. B ("Paccione May 12 Dep.") at 46–47, ECF No. 104-3. She was told that she could speak with the neighbor who lived behind the home if she had any further questions. *Id.* Town Investigator Campbell arrived at 3 Grouse Court with Paccione. *Id.* at 51. Building Inspector Schott arrived a few minutes later. *Id.*

When Paccione and Campbell arrived at the address, they knocked on the front door. *Id.* at 54. McCrae answered the door and asked the investigators what they

were doing there.  *See* McCrae Dep. at 61.  At this point, McCrae and the investigators' stories diverge.  Paccione claims that, after she and Campbell introduced themselves as from Brookhaven Town Attorney's Office, Paccione May 12 Dep. at 56, McCrae told them to "get off [his] property" and stepped toward them forcefully.  *Id.* at 58.  McCrae, on the other hand, contends that after they introduced themselves, he asked how he could help them, and "[o]ne thing led to another [and Paccione] went to call the police."  McCrae Dep. at 61–62.  Additionally, McCrae claims that at some point after the encounter began, he attempted to personally contact his landlords, but his call(s) went straight to voicemail.  McCrae Dep. at 78.  Both parties agree that after this initial interaction, Paccione and Campbell called the police to the scene.  *See* Town's Rule 56.1 Statement ¶ 30; McCrae Dep. at 62.

While waiting for the police, Paccione went to speak with the neighbor who lived behind the house.  Paccione May 12 Dep. at 59–60.  According to Paccione, the neighbor told her that "she had spoken to the owner of the house and [that] nobody was supposed to be in it."  *Id.* at 60.  Paccione claims then to have spoken with Mrs. Kim, one of the owners of 3 Grouse Court.  *Id.* at 62.  Paccione's account of this conversation is a bit inconsistent.  In her original interrogatories, Paccione claimed that she never spoke with the homeowner.  *See* Paccione Dep. dated Sept. 17, 2021, Town's Ex. C ("Paccione Sept. 17 Dep.") at 38, ECF No. 104-4.  In her first deposition, Paccione claimed that the neighbor gave her the Kims' phone number, and that then she spoke with Mrs. Kim on the phone.  Paccione May 12 Dep. at 62–63.  Paccione claimed that Mrs. Kim "said she had less than 30 days left on that house before the

bank would take it . . . and she said she has not rented to anybody, [and] nobody should be in that house." *Id.* at 63. Paccione testified that she "may have called" Mrs. Kim but was uncertain whose phone was used. *Id.* at 65. Paccione then said that the investigators got the neighbor to fax a blank version of a trespass affidavit to Mrs. Kim so that she could fill it out and fax it back to the police. *Id.* at 67.[1] Then, in her second deposition, Paccione claimed that she actually spoke to Mrs. Kim through the neighbor's phone and that the conversation was between Mrs. Kim, the neighbor, and herself. Paccione Sept. 17 Dep. at 37–39.

County of Suffolk Police Officers Provenzano and Fanwick arrived at the scene around 3:05 p.m. Provenzano Dep., Town's Ex. F at 49, ECF No. 104-7. Officer Provenzano recalls that he spoke to Paccione and she indicated that she spoke with the legal homeowner and that McCrae had no legal authority to be in the home. *Id.* at 53; *see also* Fanwick Dep., Town's Ex. G at 29, ECF No. 104-8 ("We were told by town authority that [McCrae] was not allowed to be there, that he was trying to break into the house to live there."). The officers also took note of another man at the home who was working on the boiler outside and claimed to have been hired by McCrae. *See* Provenzano Dep. at 71. Provenzano also claims that "[a] 911 call stated that Mr.

---

[1] While the Town Defendants provided in discovery a trespass affidavit allegedly signed by a "Hyejung Debbie Kim," *see* Trespass Aff., Town's Ex. Q, ECF No. 104-18, they have not produced any statements from Mrs. Kim confirming she sent a trespass affidavit (or any statements from the alleged owners of 3 Grouse Court at all). Additionally, the time stamp on the faxed affidavit reads 17:06, which is after McCrae was issued the summons. *See id.* Nor did any of the individual defendants make any representations that they ever saw this trespass affidavit before removing McCrae from the home and boarding it up.

6

McCrae was in there [only] a day." *Id.* at 66. McCrae, of course, disputes this contention and claims to have been in the home since October 15, 2017. McCrae Dep. at 22.

After speaking with Paccione, Officers Provenzano and Fanwick went to the house to speak with McCrae. Provenzano Dep. at 55. Officer Provenzano informed McCrae that the Town had spoken with the homeowner, who told them that McCrae had no legal authority to be in the home, and that he was being asked to leave. *Id.* at 57. McCrae told the officers that he lived there. Fanwick Dep. at 35. When Officer Provenzano asked who he was renting from, McCrae responded "the Asian lady." Provenzano Dep. at 58. McCrae then presented the officers with a lease. *Id.* Officer Provenzano claims that he believed the lease to be fake because "[t]here were multiple pieces of paper stapled, there was no sequence to the lease, there was no stamps, there was no nothing." *Id.* at 59.[2] According to McCrae, he also presented the officers with a driver's license that listed 3 Grouse Court as his address. McCrae Dep. at 72. Officer Fanwick claims that in looking through the windows, the home did not appear to be furnished. Fanwick Dep. at 59–60. But McCrae claims that there were "[s]ofas, TVs, couches, tables, refrigerators, dishwashers, [and] bedroom sets" in the home. McCrae Dep. at 39.

Eventually, the officers told McCrae that he had to leave the house or else he would be arrested, but he refused to do so. *See* Provenzano Dep. at 114–15; Fanwick

---

[2] No party has produced the lease or a copy of the lease in discovery. McCrae contends that he no longer has it because it was either kept by the officers or left in the home when he was ordered to vacate. *See* McCrae Dep. at 193.

Dep. at 41; *see also* McCrae Dep. at 68–69 (testifying that an officer told him, "[E]ither you go or I am locking you up"). At this juncture, it is undisputed that at or around 4:00 p.m., Officer Provenzano issued McCrae a summons for the crime of Criminal Trespass in the Third Degree. Provenzano Dep. at 105, 113. However, exactly what transpired during that time is disputed.

Officer Provenzano claims that McCrae "was issued the summons in lieu of an arrest." *Id.* at 113. After being issued the summons, Officer Provenzano testified that McCrae could remove his items from the home "while [Provenzano] was finishing up paperwork." *Id.* at 118. Officer Provenzano maintains that McCrae was never placed in handcuffs. *Id.* at 113.

McCrae, however, claims that after initially refusing to leave the residence, he was "thrown against [his] door . . . , put in handcuffs, [and] brought outside and sat on the grass." McCrae Dep. at 74. Eventually, according to McCrae, the handcuffs were removed and he was allowed to retrieve some belongings from the house before he left. *Id.* at 75. It is not disputed, however, that at some point after it was determined that McCrae was going to be removed from the property, Building Inspector William Schott, upon Paccione's request, arranged for the house to be boarded up. *See* Schott Dep., Town's Ex. E at 10–11, 20, 25 ECF No. 104-6.

## IV.    The Prosecution of McCrae

Officer Provenzano submitted the arrest report against McCrae, charging him with Criminal Trespass in the Third Degree, a violation of New York Penal Law section 140.10(a), a second-degree misdemeanor. *See* Arrest Report, County's Ex. J.,

ECF No. 108-12.  The trespassing charge was dismissed on May 15, 2019, as part of a guilty plea McCrae agreed to enter to other unrelated misdemeanor traffic charges. *See* Certificate of Disposition, County's Ex. I, ECF No. 108-11.

## PROCEDURAL HISTORY

On December 11, 2018, McCrae, at that time proceeding *pro se*, filed a complaint against the Town of Brookhaven, Ed Romaine, Dan Panico, Neil Foley, Jane Doe 1, and John Does 1 and 2.  Compl. at 1, ECF No. 1.  Romaine was the Town Supervisor, and Panico and Foley were both Town Councilmen.  *Id.* at 2–3.  McCrae brought suit under § 1983, alleging violations of his Fourth, Sixth, Seventh, and Fourteenth Amendment rights.  *Id.* at 5.  The Does were eventually identified as Campbell, Paccione, and Schott, and they were issued a summons on May 15, 2019. *See* Summons, ECF No. 10.

While simultaneously looking for counsel, on May 26, 2020, McCrae filed *pro se* an Amended Complaint on behalf of himself, minor children J.M., L.M., D.M., and Kiana Trent[3] (who he claimed lived with him in the home at the time of the incident), adding Officer Provenzano and Suffolk County as Defendants.  *See* Am. Compl. at 1, ECF No. 26.  On or about July 17, 2020, McCrae secured counsel.  Notice of Appearance of Aaron C. DePass, ECF No. 37.

---

[3] On May 12, 2021, Kiana Trent was dismissed as a plaintiff in this case. Stipulation & Order of Voluntary Dismissal, ECF No. 61.

On December 18, 2020, with the assistance of counsel, McCrae filed the operative Second Amended Complaint. *See* Second Am. Compl., ECF No. 49. In it, Police Officer Anthony Fanwick was added as a Defendant. *Id.* ¶ 27.

In the now-operative Complaint, the exact claims for relief are not a model of clarity. The First Claim is under § 1983 against all individual Defendants, simply alleging that "[b]y illegally arresting McCrae, and illegally evicting all plaintiffs thus seizing their home and personal property, defendants have deprived plaintiffs of their rights as guaranteed by the Fourth, Eighth, and Fourteenth Amendments to the U.S. Constitution." Second Am. Compl. ¶ 75. The Second Claim — also under § 1983 — alleges a conspiracy to violate plaintiffs' civil rights by "depriv[ing] plaintiffs of their home and personal property." *Id.* ¶ 80. The Third Claim asserts municipal liability under § 1983 against The Town of Brookhaven and The County of Suffolk. *Id.* ¶¶ 83–88. The Fourth through Eighth Claims for relief are all New York State law claims. *Id.* ¶¶ 89–104.

When discovery was complete, both Defendants moved for summary judgment. *See* Mots. for Pre-Mot. Conferences, ECF Nos. 78, 79. After further proceedings, the fully briefed motions for summary judgment were filed on December 4, 2023. *See* ECF No. 104; ECF No. 108. The Town of Brookhaven filed its memorandum of law in support of the Town, Paccione, Campbell, Schott, Panico, Romaine, and Foley. Mot. for Summ. J. Mem. in Supp. ("Town Br."), ECF No. 104-20. The County of Suffolk ("County") filed its memorandum of law in support of the County and Officers

Provenzano and Fanwick.  Mot. for Summ. J. Mem. in Supp. ("County Br."), ECF No. 108-16.

In their memoranda of law, Defendants interpret McCrae's § 1983 claims against the individual Defendants to be: 1) a claim of false arrest against the County Defendants in violation of the Fourth Amendment, *see* County Br. at 20–21; 2) a claim of malicious prosecution against the County Defendants in violation of the Fourth Amendment, *see id.*; 3) a claim of a property seizure (the residence and personal property) against all Defendants in violation of the Fourth Amendment, *see* Town Br. at 13–16, 20; County Br. at 26–28; 4) a procedural due process claim against all Defendants under the Fourteenth Amendment, *see* Town Br. at 20–23; County Br. at 24–26; and 5) a substantive due process claim against all Defendants under the Fourteenth Amendment, *see* County Br. at 21–24.

In his opposition briefing, McCrae does not argue that he pleaded any specific claims against the individual Defendants other than those identified in the motions for summary judgment.  *See* McCrae Mem. in Opp. to Town Defs. ("McCrae Opp. Br. (Town)"), ECF No. 105-8; McCrae Mem. in Opp. to County Defs. ("McCrae Opp. Br. (County)"), ECF No. 109-13.  Additionally, McCrae makes no argument in his briefing that any malicious prosecution claims he may have brought should not be dismissed. This Court will therefore consider any malicious prosecution claims, and any other claims against the individual Defendants under § 1983 that could be construed from the pleadings but which McCrae does not specifically assert he seeks to assert at trial in his opposition to summary judgment, as abandoned.  *See Bryant v. Steele*, 462 F.

Supp. 3d 249, 270 (E.D.N.Y. 2020) (ADS) (ARL) ("A party abandons a claim in the context of a summary judgment motion when she does not respond to arguments concerning that claim."). Additionally, McCrae explicitly disclaims each of his state law claims in his papers. *See* McCrae Opp. Br. (County) at 15; McCrae Opp. Br. (Town) at 10. Even if he had not disclaimed the state law claims, McCrae makes no argument against their dismissal, so they are deemed abandoned. *See Bryant*, 462 F. Supp. 3d at 270. McCrae has also explicitly withdrawn all claims against individual Defendants Romaine, Foley, and Panico, leaving Paccione, Campbell, and Schott as the only remaining individual Town Defendants. McCrae Opp. Br. (Town) at 10. Lastly, McCrae withdraws all claims brought on behalf of the minor children, leaving him as the sole Plaintiff. *Id.*

Based on the above, the only surviving claims to analyze for the purposes of summary judgment are McCrae's § 1983 claims against the individual Defendants, his § 1983 conspiracy claims against the individual Defendants, and his municipal liability claims under § 1983.

## **LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)). A fact is

material "when its resolution 'might affect the outcome of the suit under the governing law.'" *SCW W. LLC v. Westport Ins. Corp.*, 856 F. Supp. 2d 514, 521 (E.D.N.Y. 2012) (ADS) (AKT) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In considering a summary judgment motion, the Court "is required to view the record in the light most favorable to the party against which summary judgment is contemplated and to resolve all ambiguities and draw all factual inferences in favor of that party." *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 178 (2d Cir. 2008).

"The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact." *Thorpe v. City of New York*, No. 19-cv-5995 (CM) (RWL), 2021 WL 3811238, at *4 (S.D.N.Y. Aug. 25, 2021). "Once such a showing has been made, the non-moving party must present 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting Fed. R. Civ. P. 56(e)). "The party opposing summary judgment 'may not rely on conclusory allegations or unsubstantiated speculation.'" *Id.* (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). "Finally, the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant." *Id.*

## DISCUSSION

### I.    Fourth Amendment Claims

#### A.    False Arrest Claim Against Officers Provenzano and Fanwick

To establish a false arrest claim, a plaintiff must present facts that show "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Weyant v. Okst*, 101 F.3d 845, 853 (2d Cir. 1996) (alteration in original) (quoting *Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir. 1992))).  In its moving papers, the County does not argue that McCrae was not arrested. *See* County Br. at 19–21.  Rather, it simply argues that the officers had probable cause to effectuate an arrest. *Id.*

"An arrest undertaken without a warrant 'must be supported by probable cause or else it violates the Fourth Amendment.'" *Kayo v. Mertz*, 531 F. Supp. 3d 774, 788 (S.D.N.Y. 2021) (PAE) (quoting *United States v. Valentine*, 539 F.3d 88, 93 (2d Cir. 2008)).  And where, as here, a § 1983 plaintiff was subjected to a warrantless arrest, it is the defendants' burden to prove probable cause as an affirmative defense to the plaintiff's false arrest claim. *Dickerson v. Napolitano*, 604 F.3d 732, 751 (2d Cir. 2010) (citation omitted).

In analyzing § 1983 claims for unconstitutional false arrest, the Second Circuit has "generally looked to the law of the state in which the arrest occurred." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006) (quoting *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004)).  "Under New York law, a plaintiff claiming false arrest

14

must show, *inter alia*, that the defendant intentionally confined him without his consent and without justification." *Weyant*, 101 F.3d at 852.  Relevant here, "[t]he existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest,' whether that action is brought under state law or under § 1983.'" *Id.* (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)); *see also Jaegly*, 439 F.3d at 152 ("Under New York law, the existence of probable cause is an absolute defense to a false arrest claim.").  Thus, "a plaintiff cannot recover damages on a § 1983 false arrest claim for an arrest that was supported by probable cause." *Guan v. City of New York*, 37 F.4th 797, 805 (2d Cir. 2022).

Probable cause to arrest is "[m]ore demanding than reasonable suspicion" and "exists when the officers have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Soukaneh v. Andrzejewski*, 112 F.4th 107, 120 (2d Cir. 2024) (quoting *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007)).  "At the summary judgment stage, '[t]he question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers.'" *Smith v. City of New York*, No. 18-cv-5079 (MKV), 2021 WL 4267525, at *8 (S.D.N.Y. Sept. 20, 2021) (quoting *Weyant*, 101 F.3d at 852).  However, "where material facts on which such events and knowledge turn are disputed, summary judgment is not appropriate." *Kayo*, 531 F. Supp. 3d at 789 (citing *Weyant*, 101 F.3d

at 852); *see also Cooper v. Dieugenia*, No. 14-cv-6136 (PKC), 2017 WL 818367, at *5 (E.D.N.Y. Feb. 27, 2017) ("When the issue of probable cause is 'predominantly factual in nature,' it is appropriate for the jury to decide." (first quoting *Barksdale v. Colavita*, 506 F. App'x 82, 84 (2d Cir. 2012); then citing *Jeffreys v. City of New York*, 426 F.3d 549, 553–54 (2d Cir. 2005))).

The County asserts that as a matter of law, Officers Provenzano and Fanwick had probable cause to arrest McCrae for a violation of New York Penal Law section 140.10(a), Criminal Trespass in the Third Degree. *See* County Br. at 19. A person is guilty of Criminal Trespass in the Third Degree "when he knowingly enters or remains unlawfully in a building or upon real property which is fenced or otherwise enclosed in a manner to exclude intruders." N.Y. Penal Law § 140.10(a). "A person 'enters or remains unlawfully' in or upon premises when he is not licensed or privileged to do so." *Id.* § 140.00(5). Because not having privilege or license to remain on a premises is an element of the crime, "officers must have probable cause to believe that a person does not have permission to be where she is before they arrest her for trespass." *Davis v. City of New York*, 902 F. Supp. 2d 405, 426 (S.D.N.Y. 2012) (SAS).

In *Mitchell v. City of New York*, the Second Circuit considered whether summary judgment was properly granted in a case in which the defendant officers arrested thirty people who were attending a party in a brownstone, and in which the officers concluded that the attendees were trespassing because, in the officers' assessment, the brownstone was abandoned. 841 F.3d 72, 77–78 (2d Cir. 2016). The district court found that the officers had probable cause to arrest those present for

16

trespassing as a matter of law. *Id.* at 78. In overturning the district court's grant of summary judgment in favor of the officers, the Second Circuit found that the district court erroneously "relied heavily on the police officers' observation once they were inside the brownstone that there were extension cords running from the brownstone to another property as well as the fact that when asked, no one attending the party told the officers who owned the brownstone." *Id.* at 78. The Court also noted that "no member of the NYPD made serious efforts to verify the legal status of the brownstone," *id.* at 77, even though a "for-sale" sign indicated that there might be a person or entity with a valid claim to ownership of the house. *Id.* at 78.

Similarly, here, viewing the facts in the light most favorable to McCrae, a jury could find that the officers failed to make reasonable inquiries after being presented with information that he was not trespassing. While Officers Provenzano and Fanwick were told by City Employees that the home was supposed to be vacant, there is no evidence that Investigator Paccione verified that the person with whom she was speaking on the phone was actually the homeowner. *See generally* Paccione May 12 Dep.; Paccione Sept. 17 Dep. Then, upon speaking with McCrae, the officers were presented with different information. Chiefly, McCrae claimed to be validly permitted to live in the residence as he was renting it, and he testified at his deposition that he presented the officers with both (1) an ID that had 3 Grouse Court listed as his address and (2) a lease for the premises. McCrae Dep. at 72; Provenzano Dep. at 58, 66 (while Officer Provenzano confirmed that McCrae gave him a lease, he did not recall if McCrae gave him an ID). "The principal purpose of New York's

burglary statute is the protection of habitation rights, and the right of entry does not turn solely on the existence of an ownership interest." *Finigan v. Marshall*, 574 F.3d 57, 62 (2d Cir. 2009).  The fact that McCrae informed the Defendants that he was renting from the homeowner, and presented them with documentation that, if it proved to be valid, would have corroborated that claim, significantly undercuts the Defendants' contention that, as a matter of law, they made a reasonable determination that there was probable cause to arrest McCrae for trespassing.

Officer Provenzano claims that he reasonably determined that the lease McCrae showed him was fake because "[t]here were multiple pieces of paper stapled, there was no sequence to the lease, there was no stamps, there was no nothing." Provanzano Dep. at 59.  But that is not enough of an explanation to satisfy the formidable "burden of demonstrating the absence of a disputed material fact." *Thorpe*, 2021 WL 3811238, at *4.  A hard copy of a perfectly valid lease could well consist of multiple pieces of paper stapled together, and "stamps" are not required to make a valid lease.  Instead of further investigating the new evidence they were presented with by, for example, attempting to contact the homeowner to inquire about the lease McCrae claimed he held, the officers immediately concluded that the lease was fake.  *See* Provenzano Dep. at 59.  While it is true that an arresting officer does not necessarily have a "duty . . . to investigate exculpatory defenses offered by the person being arrested or assess the credibility of unverified claims," *Jocks v. Tavernier*, 316 F.3d 128, 135–36 (2d Cir. 2003), the Second Circuit has underscored that "the failure to make a further inquiry when a reasonable person would have done

18

so may be evidence of lack of probable cause," *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983)).  In this case, after being presented with two pieces of evidence that McCrae lived in the residence, a trier of fact could fairly determine that a reasonable officer lacked probable cause to immediately arrest him for trespass without conducting any further investigation.

For these reasons, Defendants are not entitled to summary judgment on McCrae's § 1983 false arrest claim.  *See Mitchell*, 841 F.3d at 79 (reversing grant of summary judgment for defendant-officers after "viewing the record in the light most favorable to [the plaintiffs]" and finding that "a dispute of material fact exists as to whether the police officers could have reasonably believed the [plaintiffs] were trespassers").

## B.    Qualified Immunity on Plaintiff's False Arrest Claims Against Officers Provenzano and Fanwick

The County contends that even if this Court finds that summary judgment is not appropriate on Plaintiff's § 1983 false arrest claim, this claim should nonetheless be dismissed before trial because the officers have established, as a matter of law, that they are entitled to qualified immunity on this claim.  *See* County Br. at 33–34.

"[Q]ualified immunity is available where officers of reasonable competence could disagree on whether the probable cause test was met, *i.e.*, where the existence of probable cause for an arrest was at least reasonable and arguable, 'even if mistaken.'"  *Rupp v. Buffalo*, 91 F.4th 623, 642 (2d Cir. 2024) (citations omitted) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)).  "Arguable probable cause 'exists

when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well-established law.'" *Soukaneh*, 112 F.4th at 122–23 (quoting *Lee v. Sandberg*, 136 F.3d 94, 102 (2d Cir. 1997)).  To be shielded under qualified immunity, "a reasonable officer" must have believed the actions "to be lawful, in light of clearly established law *and the information he possessed*."  *Rupp*, 91 F.4th at 642 (alteration and internal quotation marks omitted).  For a law to be "clearly established," it would be an "error to demand the specificity of a factual twin" in the case law, as "the absence of a reported case with similar facts could demonstrate nothing more than widespread compliance."  *Soukaneh*, 112 F.4th at 123 (alterations and internal quotation marks omitted) (first quoting *Collymore v. Krystal Myers, RN*, 74 F.4th 22, 29–30 (2d Cir. 2023); then quoting *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 251 (2d Cir. 2001)).

It is important to note that, "'[a]rguable' probable cause should not be misunderstood to mean 'almost' probable cause."  *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007), and "defendants have the burden of proof," *Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir. 2011)).  The Second Circuit has "repeatedly held that 'disputed material issues regarding the reasonableness of an officer's perception of the facts (whether mistaken or not) [are] the province of the jury.'"  *Moran v. Greco*, 2024 WL 1957624, at *4 (2d Cir. Apr. 12, 2024) (summary order) (quoting *Jones v. Treubig*, 963 F.3d 214, 225 (2d Cir. 2020)).

20

Here, the parties dispute the reasonableness of the officers' actions after being presented information indicating that McCrae lived at the residence. This dispute is largely based around the perceived validity of the lease presented to Officer Provenzano, as well as whether the home appeared furnished. *Compare* Provenzano Dep. at 59–60 (claiming that the lease looked fake and the home appeared to be unfurnished), *with* McCrae Dep. at 29–30 (recounting the specific terms of the lease); *compare also* Fanwick Dep. at 59–60 (claiming the home appeared to be unfurnished), *with* McCrae Dep. at 39 (stating that various items of furniture and other belongings of his, including sofas and electronics, were in the home). This precludes this Court from finding that the officers are entitled to qualified immunity at summary judgment.

Based on these factual disputes, a reasonable jury could credit McCrae's statements that the lease was valid and he in fact did have an array of personal belongings in the home. If they were to do so, even "arguable probable cause" would be lacking. In the context of an arrest for trespass, "officers must have probable cause to believe that a person does not have permission to be where [he] is." *Davis*, 902 F. Supp. 2d at 426. Additionally, it is clearly established law in this Circuit that while there is no general requirement to investigate exculpatory information, "when a reasonable person would have" made further inquiry, probable cause may be lacking. *Mitchell*, 841 F.3d at 78 (quoting *Colon*, 60 N.Y.2d at 82). If, as McCrae contends, the officers were presented with a valid lease, a driver's license that listed 3 Grouse Court as his address, and furniture inside the home, the defendant officers cannot establish

21

that their decision to arrest McCrae on trespassing charges without further investigating this information was "reasonable." This is further supported by the fact that the officers' own directives from the Suffolk County Police Department acknowledge that, even if there appears to be probable cause to conclude that a person is a squatter, but the landlord is not present, an "agent acting on behalf of the landlord must be confirmed." Suffolk County PD – Directive, McCrae Opp. to County Defs. Ex. 3 at 7, ECF No. 109-3. Although the PD Directives are not a proxy for constitutional norms, they are certainly consistent with McCrae's contention that the officers' failure to even attempt such an inquiry was an unreasonable violation of his right to be free from false arrest. Without confirmation that the person Paccione spoke to over the phone even was the landlord of 3 Grouse Court, and upon being presented with two pieces of documentary evidence ostensibly supporting McCrae's claim that he validly resided there, Defendants cannot prevail on their claim that there was "arguable" probable cause to arrest him for Trespass in the Third Degree. Thus, viewing all the evidence relevant to a qualified immunity defense "in the light most favorable to" McCrae, *Overton,* 373 F.3d at 89, the Court cannot find that Officers Provenzano and Fanwick are entitled to qualified immunity against the false arrest claims under § 1983 at the summary judgment stage.

### C.    Unlawful Seizure of McCrae's Residence Against All Individual Defendants

The Fourth Amendment, which applies to the states through the Fourteenth Amendment, prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. "A 'seizure' of property occurs when there is some meaningful interference with an

individual's possessory interest in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). In confirming that the seizure of a home implicates the Fourth Amendment and supports a cause of action under § 1983, the Supreme Court has emphasized that "'at the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home.'" *Soldal v. Cook County*, 506 U.S. 56, 61 (1992) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)).

Whether a plaintiff can assert a Fourth Amendment claim for the seizure of property turns on whether they have a "legitimate expectation of privacy" in the place seized. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). If an individual's presence in a residence is "wrongful," such as "a burglar plying his trade in a summer cabin during the off season," she would have no legitimate expectation of privacy in the property. *Rakas*, 439 U.S. at 430 n.12. Some district courts in this Circuit have found that a person enjoys no Fourth Amendment protections where "no reasonable jury could find that Plaintiff was a legal tenant," such as in a case where the court determined that the plaintiff is a trespasser and produced no evidence that he was ever allowed to be at the property. *Wilson v. Sessoms-Newton*, No. 14-cv-106 (PKC), 2017 WL 3575240, at *6 (E.D.N.Y. Aug. 17, 2017); *see, e.g.*, *Smith v. County of Nassau*, No. 10-cv-4874 (MKB), 2015 WL 1507767, at *8 (E.D.N.Y. Mar. 31, 2015) (finding that a mere licensee with no lease had no cognizable property interest).

However, courts have also found, in the case of an individual who does not own, but rather rents a home, that when the person's "initial presence is lawful[,] [they] maintain Fourth Amendment rights in his or her residence until an eviction

23

proceeding occurs." *Bonner v. Town of Brookhaven*, No. 22-cv-4690 (GRB) (ARL), 2023 WL 6812276, at *3 (E.D.N.Y. Oct. 16, 2023).   And in *United States v. Washington*, the Sixth Circuit held that even if a landlord had the right to legally evict a tenant for purported violations of the lease, if the legal machinations of an eviction had not yet commenced at the time of the challenged action, that tenant still enjoyed an expectation of privacy.  573 F.3d 279, 283–84 (6th Cir. 2009).

McCrae contends that Officers Fanwick and Provenzano, in ordering him leave the home lest he be arrested for trespassing, and not affording him enough time to gather his belongings, illegally seized both his home and the belongings within it.  *See* McCrae Opp. Br. (County) at 11–12.  Similarly, he argues that Paccione, Campbell, and Schott illegally seized his home and personal property by ordering the home boarded up, preventing him from living there or retrieving his belongings.  *See* McCrae Opp. Br. (Town) at 6–7.  McCrae asserts that any questions as to his rights of privacy in the home itself is an issue of material fact, as it is disputed "whether or not [he] entered into a lease agreement with Mrs. Kim."  *Id.*

Regarding the seizure of the home, neither the individual Town Defendants nor the individual County Defendants dispute that a seizure of the home took place. Rather, they argue that McCrae had no possessory interest in the home in the first place, as McCrae could not have been "subjected to an unlawful seizure in the context of the Fourth Amendment if the property never belonged to [him] in the first place." County Br. at 27; Town Br. at 15 ("As a squatter, McCrae did not have a legal right to occupy the Residence and, therefore, there was no possessory interest protected by

the Constitution."). The Town Defendants argue that, at most, McCrae had an "implied right of occupancy" which was "unequivocally revoked when Mrs. Kim executed the trespass affidavit." *Id.*

It is true that, "[u]nder New York law, it is well settled that a licensee acquires no possessory interest in property." *Pelt v. City of New York*, No. 11-cv-5633 (KAM) (CLP), 2013 WL 4647500, at *8 (E.D.N.Y. Aug. 28, 2013) (internal quotation marks omitted). However, the question of whether McCrae was a mere licensee or squatter — or whether he held a valid lease to rent the home from the homeowner — is exactly what is disputed. It is undisputed that McCrae presented the officers with what he represented to them was a valid lease, but the officers claim that they reasonably believed that the lease was "fake." *See* Provenzano Dep. at 58. Neither party has produced in discovery any testimony or other evidence from the owners of the house to speak on this issue one way or the other. And viewing the present record in the light most favorable to McCrae, a reasonable jury could find that he had a valid lease with the owners of 3 Grouse Court and therefore had a possessory interest in the home that was protected by the Fourth Amendment. Accordingly, Defendants' motion for summary judgment as to Plaintiff's claim of an unlawful seizure of his residence under § 1983 is denied.

## D.    Unlawful Seizure as to McCrae's Personal Property Against All Individual Defendants

McCrae also alleges an illegal seizure of his personal property from inside the residence. Personal property is seized "when there is some meaningful interference with an individual's possessory interests in that property." *Jacobsen*, 466 U.S. at 113.

"Interference can occur even when the government does not ultimately come to possess the property." *Bonner*, 2023 WL 6812276, at *4. For example, in *Bonner*, the court found a meaningful interference with property when the defendants condemned a plaintiff's residence and boarded up the building four days later, preventing plaintiffs from accessing their personal property. *See id.*

McCrae contends that the act of boarding up his residence and not allowing him to collect all of his belongings constituted a seizure under the Fourth Amendment. *See* McCrae Opp. Br. (Town) at 7. McCrae also argues that the officers at the scene "prevented [him] from retrieving his property" before he was forced to leave. McCrae Opp. Br. (County) at 12.

The Town Defendants first argue that this claim must be dismissed as "it is undisputed that the Town Defendants did not remove any property from the [r]esidence." Town Br. at 20. They rely on a footnote from a Southern District case which states that a plaintiff not being allowed "to take with him the personal items he was gathering in the basement apartment" as he was being removed from a house "would not constitute a seizure by the police at all." *Faga v. Faga*, No. 08-cv-11229 (CS), 2010 WL 11712776, at *6 n.8 (S.D.N.Y. Mar. 25, 2010). Additionally, the County Defendants argue that the property was not seized as McCrae was "afforded ample opportunity to retrieve any belongings he had in the home." County Br. at 27.

Whether or not McCrae was given ample time to retrieve his belongings from the home is exactly the sort of disputed issue of material fact that cannot be resolved at summary judgment. Officer Provenzano indicated that McCrae was just allowed

to retrieve belongings while he was "finishing up paperwork." Provenzano Dep. at 118. McCrae claimed that he was not able to bring "any personal belongings," only "quick stuff" that he could "throw . . . in the truck" like "[s]ome carry-on stuff" and a "couple of chairs." McCrae Dep. at 196. If a jury were to credit McCrae's claim that he had "[s]ofas, TVs, couches, tables, refrigerators, dishwashers, [and] bedroom sets" inside the home, *id.* at 39, it would be reasonable to conclude that the period of time in which Officer Provenzano finished up his paperwork was not sufficient for McCrae to retrieve his belongings. *See Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 185 (2d Cir. 2004) (holding that a teacher who was forced to leave his classroom "without retrieving all his belongings" did not lose "all possessory interest in any personal effects"); *see also Bonner*, 2023 WL 6812276, at *4 (finding that the Town boarding up a home four days after condemning a residence did not, as a matter of law, forfeit plaintiffs' possessory interest in the property inside the house).

The Town Defendants are also incorrect in asserting that not allowing McCrae to retrieve his property could not itself constitute a seizure. *Faga*, the case on which Defendants principally rely, involves readily distinguishable facts. There, the plaintiff did not describe or state what his personal items even were. *Faga*, 2010 WL 11712776, at *6. Additionally, and perhaps more importantly, the court in *Faga* specifically found that the plaintiff did not have a legitimate expectation of privacy in the apartment that he was ordered to vacate. *See id.* at *5. Thus, the dicta in the footnote suggesting that the police "not allow[ing] [him] to take with him the personal items he was gathering in the basement apartment" is not a seizure cannot be read

27

to contradict the well-settled principle that a person has a property interest in removing personal items before they are evicted from their own residence, and that officials' failure to permit them to do so constitutes a seizure. *Id.* at *6 n.8.

This Court agrees with the *Bonner* court's analysis: where a "town boarded up [a] building and prevented plaintiffs from accessing their personal property," the "[t]own's conduct may rise to the level of a seizure." *Bonner*, 2023 WL 6812276, at *4. Because a jury could reasonably find that McCrae had a possessory interest in the home, by removing him and not allowing him to collect his personal belongings, a jury could reasonably find that the Town and County Defendants' actions constituted a seizure, even if neither the Town nor County ever ultimately possessed those belongings. *Cf. Spangler v. Wenninger*, 388 F. App'x 507, 511 (6th Cir. 2010) (finding that dumping dirt over plaintiffs' property could constitute a seizure as "[t]he destruction of property is a 'meaningful interference' with personal property and constitutes a seizure" (quoting *Jacobsen*, 466 U.S. at 124–25)).

### E. Qualified Immunity for Paccione, Schott, Campbell, Provenzano, and Fanwick Regarding the Seizure Claims

The Town Defendants argue that even if the seizure of 3 Grouse Court and McCrae's property violated the Fourth Amendment, they are entitled to qualified immunity as "they reasonably believed, even if mistakenly, that their actions were reasonable." Town Br. at 18. The County Defendants also claim that they are protected by qualified immunity, though they do not advance any different arguments than the ones they raise with respect to qualified immunity on the false arrest claim. *See* County Br. at 33–34.

28

Qualified immunity will protect officials from liability "as long as 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When deciding a government official's qualified immunity claim on summary judgment, a court must consider (1) "whether the facts shown 'make out a violation of a constitutional right,'"; and (2) "whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). A right is clearly established when "[t]he contours of the right . . . [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 433 (2d Cir. 2004) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

For the reasons set forth *supra*, a reasonable jury could find that McCrae's Fourth Amendment right for his property to be free from unreasonable seizure was violated when he was removed from his residence and not allowed to return and collect his belongings. The next question is whether that right was clearly established at the time of this incident. Importantly, for a right to be "clearly established," the Court is not required to identify a previous case with factually identical circumstances. As long as the contours of that right are sufficiently clear, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

29

When deciding if the law was clearly established, the Court looks to "the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law." *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014). Out-of-circuit case law can also constitute "clearly established" law when a court's decision "clearly foreshadow[s] a particular ruling on the issue." *Id.* (quoting *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010)).

Taking the facts in the light most favorable to McCrae, he has shown that there was, at the time of the seizure of his residence and property, clearly established law that the Defendants' actions violated his constitutional rights. Unreasonably removing a person from their residence and not allowing them to return strikes "at the very core of the Fourth Amendment" as "the right of a man to retreat into his own home" is paramount. *Soldal*, 506 U.S. at 61. Additionally, it is clearly established that "[a] seizure occurs when there is some meaningful interference with an individual's possessory interest in [their] property." *Shaul*, 363 F.3d at 185. It was also clearly established in December 2017 that if these officials did not allow McCrae a reasonable opportunity to retrieve his property, they continued to infringe on his Fourth Amendment rights, as he did not lose "all possessory interest in any personal effects" simply because he did not gather all of his belongings when first removed from the home. *Id.*

The Defendants argue, however, that it is not clear their conduct was unreasonable. *See* Town Br. at 19. They argue that a reasonable official could have

30

believed that McCrae was illegally in the home (even if that belief was mistaken), and therefore the Town Defendants' actions in telling the police that he was not legally there and boarding up the home, and the County Defendants' actions in ejecting him and barring him from returning, are protected by qualified immunity. But like the officers' unsuccessful claim of qualified immunity on McCrae's false arrest claim, *supra*, this argument rests on the resolution of certain disputed facts and inferences from the record in Defendants' favor. And "[s]ummary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness." *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999); *see also Green v. City of New York*, 465 F.3d 65, 83 (2d Cir. 2006) ("If there is a material question of fact as to the relevant surrounding circumstances, the question of objective reasonableness is for the jury.").

Here, while the Town asserts in its brief that "Paccione learned that 24[ ]hours prior to the day in question, McCrae was unlawfully occupying 1 Grouse" and that she "spoke with the legal owner of the residence," who told her McCrae was not supposed to be there, Town Br. at 19, her depositions and interrogatories reveal that her claims as to how she contacted the owner, whether she confirmed she was speaking to the owner, or even whether she spoke to the owner at all, have changed over time, *see* Paccione May 12 Dep. at 59–67; Paccione Sept. 17 Dep. at 37–39. A jury could reasonably decline to credit her testimony in this regard. Additionally, McCrae claims that he presented the officers with a valid lease. *See* McCrae Dep. at 72. Whether or not the lease was valid, whether (and how) Paccione allegedly

confirmed that she was speaking to the actual owner, whether the home was furnished, and when McCrae moved into 3 Grouse Court are all disputed material facts that strike at the heart of the Defendants' claim that their decision to seize McCrae's home and property was a reasonable one – thus defeating Defendants' qualified immunity claim on McCrae's Fourth Amendment claims of seizure of property at summary judgment.

## II.    Due Process

### A.    Substantive Due Process

It is "well established that, '[w]here another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process.'" *Hu v. City of New York*, 927 F.3d 81, 104 (2d Cir. 2019) (alteration in original) (quoting *Southerland v. City of New York*, 680 F.3d 127, 142–43 (2d Cir. 2012)).

McCrae's substantive due process claims related to his alleged false arrest seizure of property merge with his Fourth Amendment claims and are thus barred. These claims arise from the same conduct by the officers and Town officials that he alleges violated his Fourth Amendment rights. *See, e.g.*, *Tenenbaum v. Williams*, 193 F.3d 581, 599–600 (2d Cir. 1999); *see also Lonegan v. Hasty*, 436 F. Supp. 2d 419, 440 (E.D.N.Y. 2006) (NG) (VVP) (dismissing substantive due process claims that arose from defendants' same conduct and sought a remedy for the same harms as plaintiffs' Fourth Amendment claims). Accordingly, because all of Plaintiff's substantive due

process arguments arise from specific constitutional provisions related to claims that he pled elsewhere in his Complaint, the Court grants summary judgment on Plaintiff's substantive due process claim.

## B.    Procedural Due Process

"A procedural due process claim is composed of two elements: (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process." *Radwan v. Manuel*, 55 F.4th 101, 123 (2d Cir. 2022) (quoting *Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 218 (2d Cir. 2012)). "When reviewing alleged procedural due process violations, the Supreme Court has distinguished between (a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees." *Flynn v. Bloomingdale*, No. 22-1431, 2023 WL 4832223, at *3 (2d Cir. July 28, 2023) (summary order) (quoting *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 880 (2d Cir. 1996)).

The alleged actions by the Defendants, even if a violation of McCrae's due process rights, were not part of an "established state procedure." *Hellenic Am. Neighborhood Action Comm.*, 101 F.3d at 881 (finding actions random and unauthorized when defendants were alleged to have acted in violation of a City Charter).   The Second Circuit has found that actions are not random and unauthorized, even if "contrary to law," if they are acts of "high-ranking officials who are 'ultimate decision-maker[s]' and have 'final authority over significant matters.'" *Rivera-Powell v. N.Y.C. Bd. of Elections*, 470 F.3d 458, 465 (2d Cir. 2006) (alteration

in original) (quoting *Velez v. Levy*, 401 F.3d 75, 91, 92 n.14 (2d Cir. 2005)).  But Plaintiff does not allege that Defendants fit that exception, requiring the Court to consider their actions as "random and unauthorized."

"When the state conduct in question is random and unauthorized, the state satisfies procedural due process requirements so long as it provides meaningful post-deprivation remedy."  *Id.*  McCrae does not advance any arguments in his briefing that there are no adequate post-deprivation procedures through which he could have sought to regain his property.  In fact, "[c]ourts in this circuit have consistently held that New York state law provides an adequate post-deprivation remedy for . . . property seizures."  *Palmer v. City of New York*, 564 F. Supp. 221, 249 (E.D.N.Y. 2021) (RPK) (CLP).  For example, the Second Circuit has found that "an Article 78 proceeding is sufficient post-deprivation process for an unauthorized deprivation of property."  *G.I. Home Dev. Corp. v. Weis*, 499 F. App'x 87, 89 (2d Cir. 2012) (summary order); *see also Viteritti v. Inc. Village of Bayville*, 918 F. Supp. 2d 126, 134 (E.D.N.Y. 2013) (DRH) (ARL) (holding that a procedural due process claim for deprivation of real property could not survive where "[p]laintiffs have not articulated any reason why an Article 78 proceeding was an inadequate post-deprivation remedy").  Because McCrae does not explain sufficiently allege that a post-deprivation remedy was not available to him, his procedural due process claims under § 1983 must be dismissed.

III.    **Conspiracy to Unreasonably Seize and Deprive McCrae of His Residence and Personal Property**

To prove a conspiracy under § 1983, a plaintiff must show three things: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). A plaintiff must allege facts showing "that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Forte v. City of New York*, No. 16-cv-560 (VSB), 2023 WL 6259652, at *10 (S.D.N.Y. Sept. 26, 2023) (quoting *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003)). To show this agreement, a plaintiff alleging a § 1983 conspiracy claim "must 'provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end, augmented by some details of time and place and the alleged effects of the conspiracy.'" *Blue v. City of New York*, No. 16-cv-9990 (VSB), 2018 WL 2561023, at *9 (S.D.N.Y. June 4, 2018) (quoting *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 208 (S.D.N.Y. 2013) (ER)). However, "conspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence." *Cooper v. City of New York*, No. 17-cv-1517 (NGG) (RLM), 2019 WL 3642996, at *11 (E.D.N.Y. Aug. 5, 2019) (quoting *Pangburn*, 200 F.3d at 72), *aff'd*, No. 22-cv-2792, 2024 WL 1107923 (2d Cir. Mar. 14, 2024).

Preliminarily, both the County and Town Defendants argue that any claims that the individual defendants conspired with other individuals in their own

department (*i.e.*, Town Defendants conspiring with other Town Defendants) are barred by the "intra-corporate doctrine." *See* Town Br. at 24; County Br. at 28.  The intra-corporate conspiracy doctrine theorizes that "officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other." *Leung v. Town of Oyster Bay*, No. 16-cv-4356 (ADS) (AYS), 2019 WL 5309995, at *10 (E.D.N.Y. Oct. 21, 2019).  The "Second Circuit has recognized the intra[-]corporate conspiracy doctrine in the context of [a] § 1985" claim. *Ali v. Connick*, 136 F. Supp. 3d 270, 282 (E.D.N.Y. 2015) (NGG) (VMS) (citing *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978)).  To date, "the Second Circuit has not yet applied the doctrine in § 1983 cases." *Jordan v. Wright*, No. 24-cv-1166, 2024 WL 3742767, at *8 (D. Conn. Aug. 9, 2024).  However, in the absence of mandatory authority one way or the other, courts in this circuit have applied the doctrine to § 1983 cases.  *See, e.g.*, *id.*; *Dowd v. DeMarco*, 314 F. Supp. 3d 576, 587 (S.D.N.Y. 2018) (SHS); *Leung*, 2019 WL 5309995, at *11; *Vega v. Artus*, 610 F. Supp. 2d 185, 205–06 (N.D.N.Y. 2009).  Therefore, any claims any claims of conspiracy alleging a conspiracy solely between the Town Defendants themselves or the County Defendants themselves are barred, as "this [C]ourt will continue to apply the intra[-]corporate conspiracy doctrine to [§] 1983 claims because the doctrine's logic is sound." *Anemone v. Metro. Transp. Auth.*, 419 F. Supp. 2d 602, 604 (S.D.N.Y. 2006) (MBM).[4]

_____

[4] An exception to the intra-corporate conspiracy doctrine exists where "individuals within a single entity . . . are pursuing *personal* interest wholly separate

However, the intra-corporate conspiracy doctrine does not bar claims which allege a conspiracy between individuals in different agencies. *See Dunlop v. City of New York*, No. 06-cv-433 (RJS), 2008 WL 1970002, at *13 (S.D.N.Y. May 6, 2008) (finding that a conspiracy alleged between employees of the New York County District Attorney's Office and the New York Police Department was not barred by the intra-corporate conspiracy doctrine).  Defendants argue that McCrae has "failed to 'provide [any] factual basis supporting a meeting of the minds'" between the County Defendants and the Town Defendants.  Town Br. at 25 (alteration in original) (quoting *Ivery v. Baldauf*, 284 F. Supp. 3d 426, 439 (W.D.N.Y. 2018)).  They contend that there is no actual evidence of a conspiracy, and "[t]he mere fact that individual defendants were all present at the time of the alleged constitutional violation is insufficient to support a conspiracy claim." *Gustafson v. Village of Fairport*, 106 F. Supp. 3d 340, 352 (W.D.N.Y. 2015).

However, evidence emerged in discovery from which a jury could reasonably infer a meeting of the minds.  Officer Provenzano testified that when he arrived at the scene, Paccione told him that McCrae "had no authority to be in the home and that she wanted him out."  Provenzano Dep. at 53; *see also* Fanwick Dep. at 29 ("We were told by town authority that [McCrae] was not allowed to be there[.]").  Provenzano also conveyed to McCrae that a Town official had told him McCrae had no authority to be in the home and that he was "asking him to leave."  Provenzano

---

and apart from the entity." *K.D. ex rel. Duncan*, 921 F. Supp. 2d at 210 (emphasis added).  McCrae makes no argument in his papers that this exception should apply.

Dep. at 57.  McCrae also testified that after he produced the lease, an officer showed it to an investigator, the Officers and Town officials spoke in the driveway, and then the Officers came back and told him that he had to leave or else he would be arrested. *See* McCrae Dep. at 68, 71.

Indeed, while a conspiracy can be alleged with only "circumstantial evidence," *Puglisi v. Underhill Park Taxpayer Ass'n*, 947 F. Supp. 673, 706 (S.D.N.Y. 1996) (CBM), more than circumstantial evidence has been evinced here.  As is outlined above, there is evidence that a Town Defendant told the County Defendants that she "wanted [McCrae] out."  The County Defendants then indeed removed McCrae and told him he was not to return.  This is not a case like *Spear v. Town of West Hartford*, where a conspiracy claim was dismissed because "[t]he only joint conduct alleged . . . was a meeting."  954 F.2d 63, 68 (2d Cir. 1992).  Rather, if viewed in the light most favorable to McCrae, a reasonable jury could conclude that after Paccione specifically told the County Defendants she wanted McCrae "out" and the Defendants were shown the lease, the meeting between the Town and County Defendants was where they agreed to unreasonably seize McCrae's property.  *See, e.g.*, *Green v. Howser*, 942 F.3d 772, 779–80 (7th Cir. 2019) (finding enough evidence to support a conspiracy between a child's maternal grandparents and state officials when the grandparents met with law enforcement officials and got them to execute a warrant at a certain time so they could retrieve the child).  Because there is an issue of material fact as to whether the County Defendants and the Town Defendants agreed

to take certain actions that violated McCrae's Fourth Amendment rights, Defendants are not entitled to summary judgment on the conspiracy claims.

## IV.    Municipal Liability Under *Monell*

Defendants next move to dismiss all of McCrae's claims against the Town and County, arguing that he has failed to present any evidence that would allow a jury to hold the municipalities liable for the acts of the individual defendant officers here. "[C]onstitutional torts committed by city employees without official sanction or authority do not typically implicate the municipality in the deprivation of constitutional rights, and therefore the employer-employee relationship is in itself insufficient to establish the necessary causation." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004); *see also Presti v. City of New York*, No. 21-cv-3811 (PKC) (SJB), 2024 WL 3360404, at *10 (E.D.N.Y. July 10, 2024) ("Because liability cannot be based simply on a theory of *respondeat superior*, a local government may not be sued under Section 1983 for an injury inflicted solely by its employees or agent." (alterations and internal quotation marks omitted)). However, under *Monell v. Department of Social Services of New York*, 436 U.S. 658, 690–91, 694 (1978), a municipality may be liable under § 1983 if its "policy or custom" caused a deprivation of constitutional rights. *See also Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012) ("[A] municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality."). In other words, "[a] municipality may be liable under § 1983 only if the governmental body itself subjects a person to a deprivation of rights

or causes a person to be subjected to such deprivation." *Cash v. County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (internal quotation marks omitted).

Accordingly, "[t]o hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Lucente v. County of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (second alteration in original) (quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)).

One way to establish municipal liability is by showing a "'deliberate indifference' to a recurring situation likely to result in a constitutional violation." *Buari v. City of New York*, 530 F. Supp. 3d 356, 399 (S.D.N.Y. 2021) (MKV). "In such circumstances, the policy or custom requirement is satisfied 'where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions.'" *Id.* (quoting *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007)). Thus, Plaintiff may satisfy the "policy, custom or practice" requirement by demonstrating "a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (LAP) (first citing *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997); then citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)); *see also Buari*, 530 F.

Supp. 3d at 399 ("Liability for deliberate indifference can be based upon a failure to train or a failure to supervise or discipline." (citing *Amnesty Am.*, 361 F.3d at 127)).

McCrae argues that the County and Town are subject to *Monell* liability because they showed "deliberate indifference" to the acts of their employees after being alerted to similar violations in other cases. *See* McCrae Opp. Br. (Town) at 10. In his Second Amended Complaint, McCrae asserts that he is aware "of at least 70 other residents who have suffered the same fate of being illegally evicted." Second Am. Compl. ¶ 8. But he has not produced (nor adduced) any evidence in discovery to support this allegation. And McCrae cannot rely on allegations in his Complaint at the summary judgment stage. *See, e.g.*, *Barker v. Rokosz*, No. 19-cv-514 (KAM) (JRC), 2024 WL 3322087, at *12 (E.D.N.Y. July 8, 2024).

However, McCrae does identify four other lawsuits alleging similar conduct against the Town of Brookhaven that are currently pending in the Eastern District of New York. In *Corrigan v. Town of Brookhaven*, it is alleged that Town of Brookhaven employees illegally entered plaintiffs' home, summarily condemned it, and ordered the plaintiffs to vacate the premises. No. 22-4688 (GRB) (ARL), 2023 WL 7003936, at *1 (E.D.N.Y. Oct. 24, 2023). Similarly, in *Bonner*, plaintiffs allege that after living in a residence for many years, Town of Brookhaven employees unreasonably entered their home, condemned it, and boarded it up. 2023 WL 6812276, at *1. In *Spradley v. Trejo*, it is alleged that Town of Brookhaven employees unjustly condemned plaintiffs' home and removed them from the premises. Complaint ¶ 2, *Spradley v. Trejo*, No. 19-cv-175 (LDH) (ST) (E.D.N.Y. filed Jan. 17,

2019), ECF No. 1.  Lastly, in *Shea v. Town of Brookhaven*, the plaintiffs claim that Town of Brookhaven employees (including Paccione) illegally condemned their residence, forced them to leave, and then flooded their home.  Complaint ¶¶ 8, 10, 36, 38–39, *Shea v. Town of Brookhaven*, No. 21-cv-5696 (NJC) (LGD) (E.D.N.Y. filed Oct. 12, 2021), ECF No. 1.

To support a theory under *Monell* and its progeny that the Defendants' purported constitutional violations were a result of the County's failure to train its officers, Plaintiff must establish "that the officials' purported failure to train occurred under circumstances that could constitute deliberate indifference," and must also "identify a specific deficiency in the city's training program and establish that that deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation." *Amnesty Am.*, 361 F.3d at 129 (quoting *City of Canton*, 489 U.S. at 391).

"Under the failure to supervise or discipline theory, a plaintiff must show that the municipality failed to adequately supervise or discipline its employees (thereby implicitly encouraging or ratifying their unlawful conduct) and that such a failure of supervision or discipline was tantamount to deliberate indifference." *Buari*, 530 F. Supp. 3d at 400 (alterations and internal quotation marks omitted); *see also Savarese v. City of New York*, 547 F. Supp. 3d 305, 354 (S.D.N.Y. 2021) ("Inaction can rise to the level of a municipal policy 'where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions.'" (quoting

42

*Reynolds*, 506 F.3d at 192)). "Deliberate indifference is shown when 'the need for more or better supervision to protect against constitutional violations was obvious.'" *Buari*, 530 F. Supp. 3d at 400 (quoting *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995)). "An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Id.* (quoting *Vann*, 72 F.3d at 1049).

Four federal lawsuits in a short amount of time alleging similar conduct against Town of Brookhaven employees certainly amount to "repeated complaints of civil rights violations." *Id.* And the allegations in these lawsuits certainly provide cause for McCrae to assert (as he does here) that what transpired on the day of his eviction and arrest was not an isolated incident, but also reflect the Town of Brookhaven's more general practices. On the other hand, it is well settled that to defeat a motion for summary judgment, a plaintiff cannot rely *solely* on unresolved lawsuits to proceed to trial on a *Monell* claim. *See Osterhoudt v. City of New York*, No. 10-cv-3173 (RJD) (RML), 2012 WL 4481927, at *2 (E.D.N.Y. Sept. 27, 2012) ("[P]ending lawsuits and settlement agreements will 'not suffice to overcome summary judgment . . . .'" (quoting *Ferrari v. County of Suffolk*, 790 F. Supp. 2d 34, 46 (E.D.N.Y. 2011) (JS) (WDW)). Indeed, "mere citations to lawsuits, even if they did involve comparable conduct, do not alone establish a custom or practice that is widespread and persistent, particularly if the lawsuits did not result in an adjudication of liability." *Bethune v. Westchester County*, No. 18-cv-3500 (NSR), 2020

43

WL 1032508, at *5 (S.D.N.Y. Mar. 2, 2020).    Additionally, McCrae presents no evidence that the Town has failed to take necessary action to address the constitutional violations in the wake of these other incidents. *See Falls v. Campbell*, No. 17-cv-35 (KMK), 2019 WL 1255768, at *7 (S.D.N.Y. Mar. 19, 2019) ("[E]ven if the prior lawsuits were sufficient to establish a pattern of unconstitutional activity, Plaintiff has not alleged facts demonstrating that the City 'consistently failed' to address those prior allegations."); *see also Falls v. Orange County*, No. 17-cv-1339 (VB), 2018 WL 718417, at *4 (S.D.N.Y. Feb. 5, 2018) ("A litany of prior lawsuits may suffice to put the City on notice that greater training, supervision, or officer discipline was needed, but plaintiff makes only conclusory allegations regarding the City's response to the lawsuits."); *Pryor v. City of New York*, No. 16-cv-8232 (VSB), 2018 WL 4538904, at *4 (S.D.N.Y. Sept. 21, 2018) (dismissing a *Monell* claim that referenced prior lawsuits without a disposition as they "do not plausibly allege a widespread and persistent practice sufficient to infer a policy or custom for *Monell* liability").

Most fatal for McCrae's *Monell* claim, though, is that all the lawsuits he has identified involve alleged constitutional violations that occurred *after* the December 2017 events at issue in his own lawsuit. *See* Complaint ¶ 2, *Spradley*, No. 19-cv-175 (alleging a constitutional violation in November 2018); Complaint ¶ 4, *Shea*, No. 21-cv-5696 (alleging a constitutional violation in October 2018); *Corrigan*, 2023 WL 7003936, at *1 (alleging a constitutional violation in August 2019); Complaint ¶ 4, *Bonner*, 22-cv-4690 (E.D.N.Y. filed August 8, 2022), ECF No. 1 (alleging a constitutional violation in August 2019);  Thus, McCrae cannot rely on these cases to

argue that they should have put the Town on notice of any widespread deficiencies in its employees' practices, training, or supervision before the December 2017 incident at 3 Grouse Court.

Accordingly, the Court grants summary judgment on McCrae's *Monell* claims.

## **CONCLUSION**

For the foregoing reasons, the Court denies Defendants' motion for summary judgment as to Plaintiff's § 1983 false arrest claim against Officers Provenzano and Fanwick and his unlawful seizure of property claims against all remaining individual defendants (Provenzano, Fanwick, Paccione, Schott, and Campbell). These claims will proceed to trial. The Court grants summary judgment as to McCrae's due process and *Monell* claims. All of McCrae's state law claims and his § 1983 malicious prosecution claims have been abandoned and are hereby dismissed.

SO ORDERED.                                          */s/ Nina R. Morrison*

NINA R. MORRISON
United States District Judge

Dated: Brooklyn, New York
     December 16, 2024